CAPITAL REGION AIRPORT AUTHORITY v DeWITT CHARTER
TOWNSHIP

Docket No. 201181. Submitted August 12, 1998, at Grand Rapids. Decided
July 23, 1999, at 9:00 A.M. Leave to appeal sought.

Capital Region Airport Authority, the state agency that operates Capital City Airport, brought an action in the Clinton Circuit Court against DeWitt Charter Township, seeking a declaration that the plaintiff's proposed development of airport land into a business park that would include aeronautical and nonaeronautical enterprises is exempt from the defendant's zoning ordinance and the Land Division Act, MCL 560.101 *et seq.*; MSA 26.430(101) *et seq.* On cross motions for summary disposition, the court, Randy L. Tahvonen, J., entered a judgment declaring that the plaintiff is not subject to the defendant's zoning ordinance or to the Land Division Act because the airport authorities act, MCL 259.801 *et seq.*; MSA 10.380(1) *et seq.*, conferred on the plaintiff exclusive jurisdiction over all airport operations, including land use. The defendant appealed.

The Court of Appeals *held*:

The plaintiff has exclusive authority over development of airport land for aeronautical uses, is subject to the defendant's zoning ordinance with respect to development not related to aeronautics, and is subject to the Land Division Act with respect to aeronautical and nonaeronautical development.

1. Section 7 of the airport authorities act, MCL 259.807; MSA 10.380(7), does not indicate legislative intent to grant airport authorities exclusive jurisdiction over airports within their respective territorial jurisdictions.

2. Section 9 of the airport authorities act, MCL 259.809; MSA 10.380(9), grants to airport authorities all the authority previously held by the Michigan Aeronautics Commission pursuant to the Aeronautics Code, MCL 259.1 *et seq.*; MSA 10.101 *et seq.* Section 1 of that code, MCL 259.1; MSA 10.101, demonstrates legislative intent to endow airport authorities with exclusive jurisdiction over aeronautical activities on airport property to ensure uniform regulation of aeronautics. This goal of uniform regulation would be thwarted if an airport authority's aeronautical activities were made subject to

local land-use ordinances. Sections 9, 101, and 105 of the Aeronautics Code, MCL 259.909, 259.101, 259.105; MSA 10.380(9), 10.201, 10.205, do not indicate legislative intent to grant airport authorities exclusive authority over the acquisition, development, sale, or lease of airport lands in conjunction with nonaeronautical uses. Thus, airport authorities are subject to local land-use ordinances with respect to nonaeronautical uses of airport lands. The Township Zoning Act, MCL 125.271 *et seq.*; MSA 5.2963(1) *et seq.*, enables townships to plan development and regulate land use in furtherance of the public interest. That interest is no less implicated by airport development than it is by development elsewhere. Nothing in the Township Zoning Act suggests that a township's zoning authority does not extend to development of airport land for nonaeronautical uses.

3. Because the extent to which the plaintiff's proposed uses are aeronautical in nature cannot be discerned from the record, the matter must be remanded for appropriate findings by the trial court with respect to the applicability of the defendant's zoning ordinance to the proposed uses.

4. The Land Division Act regulates the division or subdivision of tracts of land into smaller parcels for the promotion of the public health, safety, and general welfare. The public interests served by the act are valid with respect to airport lands, and the act evidences no legislative intent to exempt airport lands from the act. The plaintiff is a proprietor of land within the meaning of the act.

Reversed and remanded for further proceedings.

ZONING — TOWNSHIPS — AIRPORTS.

The development by an airport authority of airport land within a township is subject to land-use regulation by the township pursuant to the Township Zoning Act to the extent that development is for a nonaeronautical use or purpose; development for an aeronautical use or purpose is within the exclusive jurisdiction of the airport authority; the division or subdivision of airport land is subject to the Land Division Act regardless of whether the purpose for such division or subdivision is aeronautical or nonaeronautical (MCL 125.271 *et seq.*; 259.1, 259.807, 259.809, 560.101 *et seq.*; MSA 5.2963(1) *et seq.*, 10.101, 10.380[7], 10.380[9], 26.430[101] *et seq.*).

*Larry A. Salstrom,* for the plaintiff.

*J. Richard Robinson,* for the defendant.

Before: SAAD, P.J., and JANSEN and HOEKSTRA, JJ.

SAAD, P.J. Plaintiff Capital Region Airport Authority (CRAA), a state agency charged with operating Capital City Airport, brought this suit against the Charter Township of DeWitt claiming exemption from DeWitt's zoning ordinance so that it could develop a business park on airport grounds. The trial court held that DeWitt was not authorized to regulate airport land use and that the CRAA was not subject to DeWitt's land-use ordinances. DeWitt now appeals from the trial court's order granting summary disposition in favor of the CRAA pursuant to MCR 2.116(C)(10). We reverse and remand for further proceedings.

I

FACTS AND PROCEEDINGS

The CRAA is the airport authority charged with operating Capital City Airport pursuant to the airport authorities act, 1970 PA 73, as amended, MCL 259.801 *et seq.*; MSA 10.380(1) *et seq.*   Airport authorities, including the CRAA, were statutorily created in 1970 to assume the powers and responsibilities set forth in the Aeronautics Code, MCL 259.1 *et seq.*; MSA 10.101 *et seq.*   Before the enactment of 1970 PA 73, these powers and responsibilities were held by the Michigan Aeronautics Commission. MCL 259.809; MSA 10.380(9). Capital City Airport occupies land in three counties (Ingham, Clinton, and Eaton) and four municipalities (defendant DeWitt Township, Delta Township, the city of Lansing, and Watertown Township). The Aeronautics Code allows the CRAA to lease airport lands for nonaeronautical purposes, and the CRAA has apparently done so in the past without pro-

test or interference by DeWitt. MCL 259.105; MSA 10.205.

This conflict arose when the CRAA articulated its plan to develop airport lands in DeWitt contrary to DeWitt's zoning ordinance. The CRAA decided to subdivide a portion of Capital City Airport into a development to be known as the "Capital City Airport Business Park."[1] At least some of these lots were slated for lease to nonaviation-related businesses. The CRAA also negotiated plans with an existing tenant to construct a tortilla processing plant on airport grounds. These proposed developments were contrary to the zoning ordinance DeWitt promulgated pursuant to its authority under the Township Zoning Act (TZA), MCL 125.271 *et seq.*; MSA 5.2963(1) *et seq.*[2] Some of the anticipated tenants for the business park balked because they were unable to obtain DeWitt's zoning approval to operate on the airport grounds. The CRAA also made an unsuccessful attempt to obtain rezoning for the tortilla plant. DeWitt maintained that the TZA allowed DeWitt to enforce its zoning ordinance with respect to the CRAA's land use. DeWitt also argued that the CRAA was obligated to submit to DeWitt a "development plan" and to comply with the requirements in the Land Division Act (formerly the Subdivision Con-

---

[1] The actual size of the proposed development is unclear. Defendant contends that this area is to be subdivided into approximately forty lots ranging in size from one acre to seventeen acres, while plaintiff claims that twenty of these lots have actually been designated as aircraft taxi areas. The parties agree, however, that at least three of the lots were to be leased to nonaviation tenants.

[2] Before 1997, the Township Zoning Act was known as the Township Rural Zoning Act (TRZA). See 1996 PA 570, § 1; MCL 125.310(2); MSA 5.2963(40)(2). For the sake of clarity and consistency, we use the abbreviation "TZA" throughout this opinion, using brackets to indicate where quoted material used the abbreviation "TRZA."

trol Act of 1967), MCL 560.101 *et seq.*; MSA 26.430(101) *et seq.*, in order to subdivide the land in question. The CRAA denied that DeWitt had the authority to regulate the CRAA's land use: it argued that the aeronautical statutes conferred on the CRAA the exclusive jurisdiction over airport property and operations. The CRAA sued DeWitt for declaratory relief to establish the CRAA's right of exclusive jurisdiction over airport land use.

Both parties moved for summary disposition. The CRAA asserted that the Capital City Airport property was exempt from DeWitt's zoning regulations and the Land Division Act because the Legislature intended for the CRAA to have sole jurisdiction over the airport. DeWitt gainsaid the CRAA's assertion, contending that none of the relevant statutes exempted the CRAA from local regulation. The trial court ruled for the CRAA and held that the Airport Authorities Act, MCL 259.801 *et seq.*; MSA 10.380(1) *et seq.*, conferred on the CRAA exclusive jurisdiction over all airport operations, including land use, and therefore exempted the CRAA from both the zoning regulations and the Land Division Act. This appeal ensued.

We heard oral argument on August 12, 1998, one month after our Supreme Court granted leave to appeal in *Burt Twp v Dep't of Natural Resources*, 227 Mich App 252; 576 NW2d 170 (1998), lv gtd 458 Mich App 865 (1998), aff'd 459 Mich 659; 593 NW2d 534 (1999). Because *Burt Twp* also involved the issue of a state agency's alleged immunity from local land-use control, we anticipated that the Supreme Court's ruling would be dispositive of the controlling issue here. Therefore, we held this matter in abeyance pending

our Supreme Court's opinion. The Supreme Court issued its opinion on June 2, 1999.

## II

### ANALYSIS

The CRAA and DeWitt assert competing rights and interests under the aeronautical statutes and the land-use regulation enabling statutes, respectively.[3] This presents a question of law, which we review de novo on appeal. *Faircloth v Family Independence Agency*, 232 Mich App 391, 401; 591 NW2d 314 (1998).

### A

#### STATE AGENCIES' OBLIGATION TO COMPLY WITH LOCAL LAND-USE ORDINANCES

In our analysis of DeWitt's authority to regulate airport property, we begin with our Supreme Court's landmark decision in *Dearden v Detroit*, 403 Mich 257; 269 NW2d 139 (1978). *Dearden* involved a conflict between the city of Detroit's zoning regulations and the Department of Corrections' plans to operate a halfway house on leased property in a neighborhood zoned for two-family residential use. The city of Detroit refused to issue a variance permit for this use. *Id.*, 260. The Department of Corrections challenged

---

[3] Neither party has presented arguments with respect to the Airport Zoning Act, MCL 259.431 *et seq.*; MSA 10.501 *et seq.* We do not believe that this statute is relevant here, because it pertains to regulation of land use involving areas immediately adjacent to the airport property itself, and not involving areas within the boundaries of the airport. Furthermore, we find nothing in the statute that would help us discern legislative intent with respect to development of lands within airport boundaries under the TZA or any of the aeronautical statutes.

this decision, contending that because it was a state agency, it was exempt from local zoning regulations.

Our Supreme Court rejected the proposition that all state agencies are inherently immune from local zoning regulations, and ruled instead that the question was one of legislative intent. *Id.*, 264-265. The Court noted that the Legislature, in establishing the department's jurisdiction, "expressly provided" that "[s]ubject to constitutional powers vested in the executive and judicial departments of the state, the department *shall have exclusive jurisdiction* over . . . penal institutions." *Id.*, 265; MCL 791.204; MSA 28.2274. The Court read this language as a "clear expression of the Legislature's intent to vest the department with complete jurisdiction over the state's penal institutions, subject only to the constitutional powers of the executive and judiciary, and not subject in any way to any other legislative act, such as the zoning enabling act." *Dearden, supra,* 265. The Court further noted that the statute allotted to the Michigan Corrections Commission the power to "determine all matters relating to the unified development of the penal institutions." *Id.*, 266. The Court concluded:

> [T]he zoning enabling act does not indicate whether or not the Legislature intended to subject the department to local zoning ordinances. We can find no expression of a legislative intent in the language of that act to subject the department's exclusive jurisdiction over the state's penal institutions, and its duty to coordinate and adjust those institutions as an integral part of a unified, general correctional system, to the many and varied municipal zoning ordinances throughout the state. If the department were subject to those ordinances, the underlying policies of the general correctional system could be effectively thwarted

by community after community prohibiting the placement
of certain penal institutions in appropriate locations. A
careful reading of the statute establishing the department
evidences a contrary legislative intent.

We hold that in enacting MCL 791.201, *et seq.*; MSA
28.2271, *et seq.*,  the Legislature intended to grant the
Department of Corrections immunity from local zoning
ordinances when establishing state penal institutions. Con-
sequently, defendant's zoning ordinance is void to the
extent that it attempts to prohibit the use of the subject
property as a rehabilitation center. [*Id.*, 266-267.]

In sum, *Dearden* established that the question of state
agency authority versus local land control is decided
according to the legislative intent for the particular
situation, rather than a set rule favoring either the
agency or the municipality.

This Court's attempts at discerning legislative intent
for purpose of the *Dearden* analysis has resembled a
Hegelian dialectic. As will be seen in the following
discussion, this Court was initially disposed to find
agency immunity where the agency's enabling statute
authorized it to engage in the particular activity in
question, absent specific statutory language to the
contrary. In later decisions, this Court switched its
position, and became disposed to find local govern-
ment authority over the state agency absent specific
statutory language that the agency enjoyed exclusive
jurisdiction over the particular activity. Ultimately,
our Supreme Court clarified *Dearden* and called on
courts to discern legislative intent through examina-
tion of the various statutory provisions rather than
emphasis on "particular talismanic words." *Burt Twp
v Dep't of Natural Resources, supra,* 459 Mich 669.

The first noteworthy post-*Dearden* decision regard-
ing this issue came in *Marquette Co v Bd of Control*

*of Northern Michigan Univ,* 111 Mich App 521; 314 NW2d 678 (1981). Although this case actually dealt with a state agency's immunity from the State Construction Code, MCL 125.1501 *et seq.*; MSA 5.2949(1) *et seq.,* rather than a local regulation, this Court held that the issue should be decided according to the *Dearden* analysis. *Northern Michigan, supra,* 526-527. In *Northern Michigan,* a regional university contended that its status as a state agency immunized it from the requirements of the State Construction Code. This Court agreed, citing the university's enabling legislation, MCL 390.553, 390.558; MSA 15.1120(3), 15.1120(8), which provided the regional university's control board with the authority to "acquire land or acquire or erect buildings, or alter, equip or maintain them, to be used as residence halls . . . and other educational facilities." The *Northern Michigan* Court inferred from this language that the legislation provided the universities "with a kind of exclusive jurisdiction," which, under *Dearden,* exempted the university from compliance with the construction code. *Id.,* 525. According to the *Northern Michigan* rationale, statutory authorization for an agency activity, by itself, served to immunize the agency from local control (or other generally applicable regulations), absent specific statutory language to the contrary.

Ultimately, this Court abandoned the *Northern Michigan* rationale in favor of an approach that assumed—at least implicitly—that state agencies are subject to local regulations unless the agency's enabling statute expressly conferred "exclusive jurisdic-

tion" on the agency.[4] *Cody Park Ass'n v Royal Oak
School Dist,* 116 Mich App 103; 321 NW2d 855 (1982);
*Addison Twp v Dep't of State Police (On Remand),*
220 Mich App 550, 558; 560 NW2d 67 (1996).[5] In *Cody
Park, supra,* 105, a local school district claimed
exemption from a city zoning ordinance with respect
to using property for vehicle repair and parking. The
school district relied on the School Code of 1976,[6]
which gave local school boards the authority to
"[l]ocate, acquire, purchase, or lease in the name of
the school district site or sites . . . for schools, librar-
ies, administration buildings . . . ."[7] Ruling against the
district, this Court concluded that the School Code
"fails to disclose the same specificity found by the
Michigan Supreme Court in the *Dearden* ruling, to-
wit, that there is language showing a legislative inten-
tion that school districts would have exclusive juris-
diction." *Id.,* 107. This Court found "nothing in this
authorization which indicates *exclusive* school dis-
trict jurisdiction" that would exempt the board from
the local zoning ordinance.[8] *Id.,* 108. The Court stated
that "[t]he mere fact that the Legislature has specified
the designated decision-making authority for such
purposes cannot be extended to support an interpre-

---

[4] *Northern Michigan* has never been formally overruled. However, we
recognize that its rule of law has been at least superseded by the Supreme
Court's decision in *Burt Twp.*

[5] The *Burt Twp* Court declined to express any opinion regarding the
results in these cases, but noted that the decisions had "since been 'over-
ruled' by subsequent legislative amendments of the statutes at issue in
those cases." *Burt Twp, supra,* 459 Mich 664, n 3.

[6] MCL 380.201 *et seq.*; MSA 15.4201 *et seq.*

[7] MCL 380.250; MSA 15.4250.

[8] The *Cody Park* Court made no mention of the *Northern Michigan Bd
of Control* decision.

tation that such authority is exclusive and thus not subject to local zoning ordinances." *Id.*

Similarly, in *Addison Twp, supra,* 558, the Court held that the Department of State Police was subject to a local zoning ordinance in constructing a communications tower because there was "no indication" in either the TZA or the state police act[9] "that the Legislature intended to exempt the state police from local zoning ordinances, such as Addison Township's, when constructing communications towers."

Finally, in *Burt Twp, supra,* 227 Mich App 254, this Court considered Burt Township's claim that the Department of Natural Resources (DNR) was required to comply with Burt Township's zoning ordinances in constructing a boat launch. In support of its position to the contrary, the DNR argued that the Natural Resources and Environmental Protection Act[10] (NREPA) authorized the DNR to construct recreational boating facilities. *Id.,* 258. The Court rejected the DNR's argument that general language authorizing the DNR's activities was sufficient to confer on it exclusive jurisdiction. *Id.,* 258-259. Applying the *Cody Park Ass'n* and *Addison Twp* analyses, this Court concluded that "[t]he passages of the NREPA . . . do not show a clear legislative intent that the DNR's activities be exempt from local zoning ordinances." *Id.,* 260.

Reviewing this Court's decision in *Burt Twp,* the Michigan Supreme Court affirmed the result, but clarified the proper application of the *Dearden* analysis. *Burt Twp, supra,* 459 Mich 669-671. The Michigan

---

[9] MCL 28.1 *et seq.;* MSA 4.431 *et seq.*

[10] MCL 324.101 *et seq.;* MSA 13A.101 *et seq.*

Supreme Court rejected the focus on "exclusive juris-
diction" language:

> While the presence of such terms as "exclusive jurisdic-
> tion" certainly would be indicative of a legislative intent to
> immunize the DNR from local zoning ordinances, we decline
> to require that the Legislature use any particular talismanic
> words to indicate its intent. The Legislature need only use
> terms that convey its clear intention that the grant of juris-
> diction given is, in fact, exclusive. Whatever terms are actu-
> ally employed by the Legislature, our task is to examine the
> various statutory provisions at issue and attempt to discern
> the legislative intent in enacting them. [*Id.*, 669.]

The Court then concluded:

> The DNR places great emphasis on the mandatory nature
> of the duties expressed in the NREPA, as evidenced by the
> Legislature's repeated use of the term "shall," as well as the
> fact that the DNR is given the "power and jurisdiction" to
> manage and control lands under the public domain. How-
> ever, we are not persuaded that the Legislature, in directing
> that the DNR engage in certain governmental functions,
> intended that the DNR be authorized to do so in any manner
> it chooses. According the DNR "power and jurisdiction" to
> manage land within its control is not the same as granting it
> *exclusive* jurisdiction. Thus, the fact that the DNR is man-
> dated to create recreational facilities on public land it man-
> ages and controls does not indicate a legislative intent that
> the DNR may do so in contravention of local zoning ordi-
> nances. [*Id.*, 669-670 (emphasis in original).]

The Court also considered the TZA, with its broad
grant of authority to townships to regulate local land
use, and the Township Planning Act (TPA).[11]

---

[11] MCL 125.321 *et seq.*;  MSA 5.2963(101) *et seq.*

The [TZA] broadly vests authority in townships to regulate land development "to meet the needs of the state's citizens for . . . recreation . . . and other uses of land . . . ." MCL 125.271(1); MSA 5.2963(1)(1). The [TZA] further provides that zoning ordinances shall be based on a plan designed to, among other things, "conserve natural resources." MCL 125.273; MSA 5.2963(3). Indeed, the status and force of this zoning authority is enhanced by our state constitution. Const 1963, art 7, § 34 provides that statutory provisions relating to townships "shall be liberally construed in their favor."

In addition to the broad grant of regulatory authority contained in the [TZA], we also believe the township planning act (TPA), MCL 125.321 *et seq.*; MSA 5.2963(101) *et seq.*, to be particularly relevant in this case involving waterfront development. The TPA provides that a basic zoning plan shall show the planning commission's recommendations for the development of the township and include certain subjects pertinent to the future development of the township, including the general location, character, and extent of, among other things, "waterways and water front developments." MCL 125.327(2)(b); MSA 5.2963(107)(2)(b).

These statutory provisions reveal that the [TZA] and the TPA provide townships with extensive authority to regulate the use and development of land within their borders, including waterfront property. Moreover, this Court in *Dearden* declined to adopt a rule that state agencies have inherent immunity from local zoning ordinances. *Dearden, supra* at 261. Thus, we conclude that it is incumbent upon the DNR to establish a clear legislative intent to exempt the DNR's activities from the Burt Township zoning ordinance. [*Burt Twp, supra,* 459 Mich 665-666 (citations omitted).]

The Court concluded that the "NREPA and the [TZA] appear to provide coextensive statutory rights concerning the protection of natural resources in general and the development of recreation facilities and other waterfront developments in particular." *Id.*, 671. The

Supreme Court therefore affirmed this Court's decision, albeit by a different analysis.

Following *Burt Twp*'s mandate, we will review the various aeronautics statutes and the TZA in order to discern legislative intent.

B

CAPITAL REGION AIRPORT AUTHORITY'S OBLIGATION TO COMPLY
WITH DEWITT TOWNSHIP'S ORDINANCE

The CRAA contends that its exclusive jurisdiction over airport lands is provided by §§ 1, 7, and 9 of the airport authorities act. MCL 259.801, 259.807, 259.809; MSA 10.380(1), 10.380(7), 10.380(9). Section 1 provides for the creation of airport authorities, including the CRAA, but does not specify the authorities' powers and limitations. MCL 259.801; MSA 10.380(1). Section 7 provides:

> The authority shall be a public body corporate with powers to sue or be sued in any court of this state and have the *power and duty of planning, promoting, extending, owning, maintaining, acquiring, purchasing, constructing, improving, enlarging and operating all publicly-owned airports and airport facilities* hereinafter established to be operated within the territorial jurisdiction of the authority. Any existing publicly-owned airport or airport facility now or hereafter within the jurisdictional confines of the authority may elect to come within the operational jurisdiction of the authority unless prohibited by legal restrictions or limitations, upon acceptance by the authority under mutually agreeable terms and conditions. [MCL 259.807;    MSA 10.380(7) (emphasis supplied).]

On the basis of this provision, we find no indication that the Legislature intended for the CRAA to exercise exclusive jurisdiction over the airport. This provision

is comparable to the NREPA: Just as the NREPA's grant of authority to the DNR with respect to boating facilities did not relieve the DNR of its obligations to comply with local land use regulations, § 7's grant of authority to the CRAA with respect to airport facilities does not so relieve the CRAA.

Section 9 of the airport authorities act, MCL 259.809; MSA 10.380(9), grants to the CRAA all the authority previously held by the Michigan Aeronautics Commission pursuant to the Aeronautics Code,[12] and the community airport act.[13] Section 1 of the Aeronautics Code provides, in pertinent part:

> It is hereby declared that the purpose of this act is to further the public interest and aeronautical progress by providing for the protection and promotion of safety in aeronautics; by cooperating in effecting a *uniformity of the laws* relating to the development and *regulation of aeronautics* in the several states; by revising existing statutes relative to the development and regulation of aeronautics *so as to grant to a state agency such power and impose upon it such duties that the state may properly perform its functions relative to aeronautics and effectively exercise its jurisdiction over persons and property within such jurisdiction,* may develop a statewide system of airports, *may cooperate with and assist the political subdivisions of this state* and others engaged in *aeronautics,* and may encourage and develop *aeronautics* . . . . [MCL 259.1; MSA 10.101 (emphasis supplied).]

Although phrases such as "exclusive jurisdiction" do not appear in this provision, nonetheless, this provision demonstrates a legislative intent to endow the state agency (first, the commission, now, the airport

---

[12] MCL 259.1; MSA 10.101 to MCL 259.208; MSA 10.308.
[13] MCL 259.621; MSA 10.311 to MCL 259.631; MSA 10.321.

authority) with exclusive jurisdiction over aeronautical activities on airport property. The phrase stating that the purpose of the act is to "further the public interest and aeronautical progress . . . by cooperating in effecting a uniformity of the laws relating to the development and regulation of aeronautics in the several states" declares an intent for the agency to cooperate with other states in developing uniform aeronautical regulations in order to promote aeronautical progress for the public good. Clearly, this goal would be thwarted if the agency's aeronautical activities were subject to local land-use ordinances. This would hamper uniformity not only from airport to airport, but also within an individual airport where, as here, the airport grounds lie in more than one municipality. Furthermore, the language stating that the Aeronautics Code will fulfill its purpose "by revising existing statutes relative to the development and regulation of aeronautics so as to grant to a state agency such power and impose upon it such duties that the *state* may properly perform its functions relative to aeronautics and effectively exercise its jurisdiction over persons and property within such jurisdiction" reveals an intent to keep aeronautical supervision at the *state* level. This language indicates that when the Legislature enacted the Aeronautics Code, it did not intend to merely enable the agency to operate airports. Rather, this language expresses a legislative intent to charge the agency with the responsibility of promoting aeronautical activities for the public good, and to confer on the agency all the power necessary to perform this function. This legislative goal would be substantially undermined if the agency's authority over aeronautics were subordinated to a local govern-

ment's land-use regulations. Indeed, DeWitt has not attempted to regulate any of the CRAA's aeronautical activities.

While the Aeronautics Code, by virtue of § 9 of the airport authorities act, confers on the CRAA exclusive authority over aeronautical operations at Capital City Airport, it makes no mention of the agency's authority over *nonaeronautical* activities conducted on airport grounds. The CRAA relies on § 101 of the Aeronautics Code, which provides that the airport authority

> may, on behalf of and in the name of this state, acquire by purchase, gift, devise, lease, condemnation proceedings, or otherwise, property real or personal, for the purpose of establishing and constructing *airports, landing fields, and other aeronautical facilities*, and may acquire in the same manner, own, control, establish, construct, enlarge, improve, maintain, equip, operate, regulate, and police these facilities, within this state. The [CRAA] may dispose of any property acquired under this section, in accordance with the laws of this state governing the disposition of other similar property of the state. [MCL 259.101; MSA 10.201 (emphasis supplied).]

The CRAA also relies on § 105, which grants the CRAA the authority to lease the Capital City Airport property for periods not exceeding fifty years, for aeronautical as well as nonaeronautical purposes. MCL 259.105(a), (e); MSA 10.205(a), (e).

We find that neither of these provisions expresses a legislative intent that the CRAA have exclusive authority over the acquisition, development, sale, or lease of airport land in conjunction with *nonaeronautical* uses. Section 101 speaks only of land related to aeronautical functions. Although § 105 authorizes the CRAA to lease airport property for nonaeronautical pur-

poses, we find no statutory language evincing a legislative intent for the CRAA to have exclusive jurisdiction over these leases and developments. Section 105 merely authorizes the CRAA to engage in this activity, which is not sufficient to immunize the CRAA from local regulation. *Burt Twp, supra,* 459 Mich 670. In *Burt Twp,* the Supreme Court was "not persuaded that the Legislature, in directing that the DNR engage in certain governmental functions, intended that the DNR be authorized to do so in any manner it chooses." *Id.,* 669-670. Analogously, we are not persuaded that the Legislature intended for the CRAA to have authority to lease airport land in contravention of local zoning. Accordingly, we find no legislative intent to exempt the CRAA from local land-use ordinances with respect to lease or development of land for nonaeronautical functions.

Our review of the TZA further supports our conclusion that the CRAA enjoys exclusive authority over aeronautical functions, but not over nonaeronautical functions. The TZA provides, in pertinent part:

> The township board of an organized township in this state may provide by zoning ordinance for the regulation of land development and the establishment of districts in the portions of the township outside the limits of cities and villages which regulate the *use of land and structures*; to meet the needs of the state's citizens for food, fiber, energy, and other natural resources, places of residence, recreation, industry, trade, service, and other uses of land; *to insure that use of the land shall be situated in appropriate locations and relationships; to limit the inappropriate overcrowding of land and congestion of population, transportation systems, and other public facilities; to facilitate adequate and efficient provision for transportation systems, sewage disposal, water, energy, education, recreation, and other public service and facility requirements;*

*and to promote public health, safety, and welfare.* . . . [MCL
125.271(1); MSA 5.2963(1) (emphasis supplied).]

The TZA thus enables the township to plan develop-
ment and regulate land use in furtherance of the pub-
lic interest. This public interest is no less implicated
by airport development than it is by development
elsewhere. We therefore find nothing in the TZA that
suggests that a township's zoning authority does not
extend to nonaeronautical airport development.

Moreover, like the *Burt Twp* Court, we find it note-
worthy that while the TZA is silent with respect to air-
ports, it nonetheless contains specific exemptions for
uses such as oil and gas wells and licensed residential
facilities. *Burt Twp, supra,* 459 Mich 670; MCL
125.271(1) and 125.286(a); MSA 5.2963(1)(1) and
5.2963(16a). Under the maxim "expressio unius est
exclusio alterius," (the expression of one thing is the
exclusion of another), this Court has stated that the
express mention of one thing in a statute implies the
exclusion of other similar things. *United States Fidel-
ity v Amerisure Ins Co,* 195 Mich App 1, 6; 489 NW2d
115 (1992). Thus, by making express exemptions in
the TZA for wells and residential facilities, the Legisla-
ture precluded findings of implicit exemptions for
other land uses. In the words of the *Burt Twp* Court,
"the Legislature has demonstrated that it was aware
of overriding land-use issues that warranted specific
exemption from local regulation but provided no such
exemption for the DNR's activities. This fact provides
additional assurance that there was no legislative
intent to exempt the DNR here." *Burt Twp, supra,* 459
Mich 670-671. Likewise, we find no legislative intent
to exempt airports in the TZA.

In sum, with respect to the CRAA's proposed development of airport lands for nonaeronautical uses, we find no legislative intent for the CRAA to be exempt from local regulation. We also find that such development implicates DeWitt's zoning authority under the TZA. This is analogous to the relationship between Burt Township's zoning authority and the DNR's authority to construct boating facilities. Accordingly, we conclude that DeWitt and the CRAA share coextensive authority over nonaeronautical development of the land at Capital City Airport.

We are unable to discern, from the record before us, the extent to which the CRAA's proposed uses are aeronautical in nature and therefore exempt from the zoning ordinance. At least two of the uses specifically discussed in the briefs—the tortilla processing plant and the small animal kennel—are clearly unrelated to aeronautics. However, we remand so that the trial court may make appropriate findings in accordance with our decision.

C

CAPITAL REGION AIRPORT AUTHORITY'S OBLIGATION TO COMPLY
WITH THE LAND DIVISION CONTROL ACT

DeWitt also argues that the trial court erroneously determined that the CRAA is exempt from the requirements of the Land Division Act. We agree.

We find no merit to the CRAA's argument that as a state agency, it may divide its land free of any obligation to comply with the Land Division Act, MCL 560.101 *et seq.*; MSA 26.430(101) *et seq.* As we discussed in the preceding section of this opinion, the CRAA's exclusive authority over the airport's aeronauti-

cal activities does not endow the CRAA with exclusive authority over airport land used for nonaeronautical purposes.

The Land Division Act regulates the division or subdivision of tracts of land into smaller parcels. Proprietors who wish to divide or subdivide land must obtain local government approval in accordance with MCL 560.109; MSA 26.430(109). The Land Division Act states that the purpose of the act is to "regulate the division of land; to promote the public health, safety, and general welfare." The caption also lists more specific purposes of the act, such as proper surveying and floodplain regulation. 1967 PA 288. As with the TZA, we find that the public interests served by the Land Division Act are valid with respect to airport lands. We therefore find no indication in the Land Division Act that the Legislature intended for airport lands to be exempt.

Furthermore, § 103 of the Land Division Act, MCL 560.103; MSA 26.430(103), provides for certain exceptions, none of which is applicable here, for plats of retracement or boundary surveys made by a government agency. Again, we rely on the maxim "expressio unius est exclusio alterius," *United States Fidelity*, *supra*, 6, and conclude that if the Legislature had also wished to exempt all state-owned lands from the Land Division Act, it could have done so.

The CRAA also contends that it is not a "proprietor" within the meaning of the statute. We disagree. The statute defines "proprietor" as

a natural person, firm, association, partnership, corporation, or combination of any of them that holds an ownership interest in land whether recorded or not. [MCL 560.102(o); MSA 26.430(102)(o).]

The CRAA is a corporation under MCL 259.807; MSA 10.380(7). Therefore, the CRAA is a "proprietor" within the meaning of this act.

On this record, we are unable to determine the extent to which any proposed division or subdivision would involve a nonaeronautical purpose. We therefore remand for resolution of this issue.

Reversed and remanded for further proceedings in accordance with our opinion. We do not retain jurisdiction.