*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JACQUELINE DAVIS,

      Plaintiff-Appellant,

v

BetMGM, LLC,

      Defendant-Appellee.

FOR PUBLICATION
September 28, 2023

No. 363116
Wayne Circuit Court
LC No. 21-006981-CK

Before: BOONSTRA, P.J., and LETICA and FEENEY, JJ.

FEENEY, J. (*dissenting*).

Because the majority's decision leaves plaintiff without a forum in which to pursue a remedy for her claim, I respectfully dissent.[1]

Plaintiff is of the belief that defendant owes her over $3 million in winnings from her wagering activity on defendant's internet gambling site. When defendant refused to pay all of the claimed winnings,[2] plaintiff filed suit in circuit court, alleging fraud, conversion, and breach of contract. As discussed in the majority opinion, the trial court dismissed the suit on the basis that the Lawful Internet Gaming Act (LIGA)[3] preempted plaintiff's claims.

By contrast, the Michigan Gaming Control Board (MGCB) takes the position that it does not resolve patron disputes. In a January 24, 2022 email from Assistant Attorney General Mark

---

[1] I offer no opinion on the validity of the claims raised by plaintiff nor whether she is entitled to a remedy. I merely conclude that, under the law, plaintiff is entitled to bring her claims to circuit court for adjudication of the validity of those claims.

[2] Plaintiff did receive $100,000 of her claimed winnings before defendant refused to pay the remainder, claiming a malfunction in the gaming platform. Again, I form no opinion on whether there was such a malfunction or even whether, if there were, it would relieve defendant of its obligation to pay the claimed winnings.

[3] MCL 432.301 *et seq*.

Sands of the Alcohol and Gambling Enforcement Division to plaintiff's counsel, AAG Sands states:

> Thank you for speaking with us last month on the Davis v BetMGM matter and for the documentation you provided for our review. Based on our review of that information and after discussion with our client agency, the Michigan Gaming Control Board states as follows:
>
> The Michigan Gaming Control Board is tasked with regulating online gaming in the State. The patron complaint process exists to inform the Board of potential violations of the Lawful Internet Gaming Act and Rules by its licensees. Based on the receipt of such a complaint, the Board may exercise its discretion to investigate. Upon the receipt of a patron complaint, an investigation, and the finding of a violation of the Act or Rules, the Board may direct a licensee to take any corrective action the board considers appropriate. But what the Board does not do is determine the validity of a dispute between the authorized participant and the licensee. That is, the determination that a licensee has or has not violated the Act or Rules is not an adjudication on the merits of the underlying authorized participant/licensee dispute because the Board does not have the authority to adjudicate such a dispute.

Clearly the Attorney General's position, and by extension the position of the MGCB, is that the MGCB is to enforce the statute and the gaming rules, and that it is not the MGCB's role to adjudicate disputes between patrons and casinos. The deputy director of the MGCB's February 2022 letter, quoted by the majority, further supports this position. The letter informed plaintiff that "the patron complaint process exists to inform the Board of potential violations of the Lawful Internet Gaming Act and Rules by its licensees." It makes explicit that "MGCB investigations are not intended to determine the merits of any outstanding dispute or litigation between an authorized participant and the internet gaming operator . . . ."[4]

The trial court, as well as the majority, relies heavily on this Court's decision in *Kraft v Detroit Entertainment, LLC*,[5] for the proposition that plaintiff's common-law claims are preempted

---

[4] In a June 2022 letter, the MGCB indicated that defendant had violated the MGCB's rules by not timely informing the MGCB of the claimed malfunction and not timely providing information to the MGCB when requested, but that "[t]he Board has decided not to pursue formal disciplinary action at this time. Please be advised that any further violation of the Lawful Internet Gaming Act or Michigan Internet Gaming Rules may result in formal disciplinary action." This determination further reflects the MGCB's role as one of taking licensing actions, not resolving patron disputes.

[5] 261 Mich App 534; 683 NW2d 200 (2004).

by statute.[6]  The fraud claims in *Kraft* involved the design of the slot machines at issue that were approved by the Gaming Board.  *Kraft*[7] described the machines and the source of the complaint:

> These slot machines operate like traditional three-reel slot machines, but also feature a "bonus wheel" that activates when a certain combination is displayed on the slot machine reels.   The bonus wheel consists of twenty-two equally proportioned pie-shaped pieces and looks like the wheel utilized on the popular television game show "Wheel of Fortune."  Each pie-shaped section has a number between twenty and one thousand that represents the number of coins the player wins when the wheel stops on that number.  A computer program within the machine determines where the bonus wheel will stop when it is activated.  The chances of stopping on one of the higher payoff numbers is significantly smaller than the chances of stopping on one of the lower payoff numbers.   [The manufacturer's] patent for these slot machines states that the bonus wheel can provide players "a realistic sense of a totally mechanical indicator," but that the internal computer program will "randomly select the winning payout according to a predetermined frequency of occurrence for each individual bonus payout, and then cause the bonus indicator to stop at the desired area."

The essence of the plaintiff's fraud claim in *Kraft* was that the slot machine's appearance gave the impression that there was an equal chance of winning each of the different payoff amounts when, in fact, the odds were significantly less for the higher payoff amounts.[8]

After discussing the preemption principle that laws, including the common law, inconsistent with the gaming act are inapplicable, *Kraft* turns to the core question presented: "Having concluded that MCL 432.203(3) precludes inconsistent common-law actions, we must next determine whether recognizing plaintiff's actions for fraud and unjust enrichment based on defendants' failure to disclose the odds of winning a large payoff on the 'bonus wheel' would be 'inconsistent' with the act."[9]  The court determined that recognizing the plaintiff's common-law

---

[6] *Kraft* dealt with preemption by the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 *et seq*., which regulates physical casinos, rather than by LIGA, which regulates on-line gaming.  Both the majority and the trial court find that there are sufficient similarities between the two acts to support reaching the same conclusion under LIGA as under MGCRA with respect to preemption.  Because I conclude that there are sufficient differences between the underlying claims in this case and in *Kraft*, I need not address the debate between the similarities and the differences of the two acts.  That is, even if the similarities of the statutes are sufficient to conclude that *Kraft* would guide the outcome in a case with similar facts under LIGA, the facts here are sufficiently different so that *Kraft* is inapplicable.

[7] 261 Mich App at 537-538.

[8] For example, although the "pie sections" were of equal size on the machine, the odds of winning 50 coins was 18 out of 256 spins, while winning 1,000 coins was 1 out of 256 spins.  261 Mich App at 537-538 n2.

[9] 261 Mich App at 551.

fraud and unjust enrichment claims would be inconsistent with the gaming act and the Board's authority to approve certain games:

> Because the MGCB monitors casino games to ensure integrity and, thus, to prevent fraud and deceit, we conclude that plaintiff's common-law claims are inconsistent with the MGCRA under MCL 432.203(3) and are thus inapplicable against defendants. We agree with defendants and the trial court that recognizing the common-law claims alleged by plaintiff would prohibit, through common-law duties to disclose in the context of fraud or unjust enrichment, that which was permitted by the MGCB under the MGCRA. Imposition of liability under those circumstances would give rise to conflicting standards for gaming device manufacturers and casino licensees because a casino licensee could use a gaming device that had been vigorously tested and approved by the MGCB, only to have a different standard imposed through the medium of the common law.

Or, to put it more simply, the *Kraft* court determined that the plaintiff could not maintain a claim based upon an argument that, at its core, maintains that the Gaming Board should not have approved this particular slot machine for use in a Michigan casino.

The case before of us, however, is not based upon a claim that plaintiff was lured into playing "Luck O' the Roulette" because she was misled into believing that her chances of winning were greater than what they actually were.[10] Rather, it is based upon a claim that defendant's platform informed her that she had won, that she had won a specific amount, and then defendant refused to pay her the winnings.[11]

Next, the majority points to MCL 432.309, which sets forth the authority of the MGCB. The statute provides an exhaustive list. But a review of that list reflects extensive authority over the licensing of on-line casinos, an establishment of rules by which those licenses are obtained

---

[10] Although there are some similarities between plaintiff's fraud allegations in this case and those in *Kraft*, there are significant differences as well. As discussed, the alleged fraud in *Kraft* was, in essence, that the game design visually misrepresented the odds of winning a particular payout, thus inducing the player to bet. Here, although plaintiff's fraud allegations at least in part claim that the fraud affected her betting decisions, it is not based upon a game design. Indeed, defendant's primary position is that plaintiff was credited with winnings that the game was not designed to award, but rather upon a malfunction. While in *Kraft* the Gaming Board approved a game design with the particular payout odds, presumably the Gaming Board in this case did not approve a game that intentionally malfunctioned or otherwise intentionally mispresents the player's winnings.

[11] Even plaintiff's fraud claim is framed differently than the claim in *Kraft*. It argues not a fraudulent inducement in the design of the game, but that defendant left the game platform operational for three days after it claims to have identified the malfunction allowing plaintiff and other players to continue to play the game under a belief that the game was properly operating. And plaintiff's conversion and breach of contract claims, which are grounded in defendant's refusal to pay her winnings, bear even less resemblance to the claims in *Kraft*.

(and perhaps revoked), casino operations, and procedures for sanctioning on-line casinos that violate the statute and rules. What is not found in the list is the authority, much less the obligation, to resolve individual patron disputes such as that presented here.[12]

I do not disagree with the majority that the Gaming Board has the authority and responsibility to investigate defendant over this incident and determine what, if any, licensing sanctions are appropriate.[13] But plaintiff's suit does not seek licensing sanctions against defendant; plaintiff seeks payment of the money that defendant's gaming platform told her that she had won.

I compare this case to administrative actions regarding licensed professionals and malpractice. For example, if a physician harms a patient due to the physician's professional negligence, it may result in disciplinary action by the licensing board.[14] Despite the administrative remedies that incompetency imposes on a physician's license, a patient who is harmed by that incompetence may nevertheless pursue a tort claim for medical malpractice in circuit court. And

---

[12] The majority also points to MCL 432.313, which establishes criminal penalties for various violations of the act. It is certainly possible that defendant, if it intentionally took action to cheat plaintiff out of her payout, may face criminal charges (assuming that it meets the definition of "a person"). See MCL 432.313(1)(e). But any such charges are not litigated by or in front of the Gaming Board; rather, criminal charges are brought by the attorney general or a county prosecutor "in the county in which the violation occurred or in Ingham County." MCL 432.313(5). If anything, this section of LIGA demonstrates that the Gaming Board does not have exclusive jurisdiction over all of internet gambling in Michigan.

[13] As noted above, the Gaming Board chose to issue a warning and not pursue formal disciplinary action.

[14] MCL 333.16221 provides in pertinent part as follows:

> Subject to section 16221b, the department shall investigate any allegation that 1 or more of the grounds for disciplinary subcommittee action under this section exist, and may investigate activities related to the practice of a health profession by a licensee, a registrant, or an applicant for licensure or registration. The department may hold hearings, administer oaths, and order the taking of relevant testimony. After its investigation, the department shall provide a copy of the administrative complaint to the appropriate disciplinary subcommittee. The disciplinary subcommittee shall proceed under section 16226 if it finds that 1 or more of the following grounds exist:
>
> (a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.

MCL 333.16226 provides for a variety of sanctions, including revocation of a license.

this is true even though there is an extensive administrative framework regarding the licensing and discipline of medical professionals.[15]

Clearly, administrative oversight of a licensed profession or business does not preclude tort or contract suits in circuit court arising out of alleged misconduct by that professional or business. Indeed, the Legislature can vest exclusive jurisdiction in administrative agencies,[16] as this Court observed in another casino case, *Papas v Gaming Control Board*:[17]

> Circuit courts are courts of general jurisdiction, vested with original jurisdiction over all civil claims and remedies "except where exclusive jurisdiction is given in the constitution or by statute to some other court...." MCL § 600.605; *Bowie v Arder*, 441 Mich 23, 50; 490 NW2d 568 (1992). In *Citizens for Common Sense in Gov't*, [243 Mich App 43, 50; 620 NW2d 546 (2000)], this Court explained:
>
>> The circuit courts of this state have subject-matter jurisdiction to issue declaratory rulings, injunctions, or writs of mandamus. Const 1963, art 6, § 13; MCL § 600.605.... However, if the Legislature has expressed an intent to make an administrative tribunal's jurisdiction exclusive, then the circuit court cannot exercise jurisdiction over those same areas. MCL § 600.605....
>
> This Court has not required the phrase "exclusive jurisdiction" to appear in a statutory provision in order to find that jurisdiction has been vested exclusively in an administrative agency. *Capital Region Airport Auth v DeWitt Charter Twp*, 236 Mich App 576, 590-591; 601 NW2d 141 (1999). As long as the statutory language chosen by the Legislature establishes the intent to endow the state agency with exclusive jurisdiction, courts must decline to exercise jurisdiction until all administrative proceedings are complete. *Id*.

Although the *Papas* majority concluded that the MGCB had exclusive jurisdiction in that case, like *Kraft*, it involved the question of *licensing*. Specifically, whether the owners of several hospitality businesses had to be licensed as "suppliers" to the Greektown Casino in order to accept vouchers issued by the casino to casino patrons and be reimbursed by the casino. This Court concluded that the determination whether the plaintiffs were "suppliers," and thus required to be licensed by the defendant, came within the defendant's exclusive jurisdiction.

---

[15] Indeed, one might argue that the administrative oversight of medical professionals is even more extensive than that of internet casinos under LIGA.

[16] For example, the worker's disability compensation act of 1969, MCL 418.101, establishes an extensive administrative schema to resolve disputes over the payment of compensation benefits. And, that process is ultimately subject to judicial review. MCL 418.861a(14).

[17] 257 Mich App 647, 657; 669 NW2d 326 (2003).

In sum, I conclude that while licensing issues, including administrative disciplinary actions against a licensee, come within the Gaming Board's exclusive jurisdiction, disputes by a patron seeking a remedy in tort or contract do not come within the Gaming Board's jurisdiction.[18] Accordingly, I disagree with the majority that plaintiff cannot pursue her claims in circuit court. And by denying plaintiff a forum by which to pursue her claim of unpaid winnings, the majority's decision lends a new meaning to the old gambling adage that the House always wins.

I would reverse.

/s/ Kathleen A. Feeney

---

[18] Except, of course, to the extent that the basis of those claims also give rise to sanctions against the casino's license, like a physician who might face both a malpractice suit and the revocation of their medical license arising from the negligent care.